<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, et al., | : | CIVIL ACTION NO. 97-289 (MLC) |
| | : | **MEMORANDUM OPINION** |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DOMINICK MANZO, et al., | : | |
| | : | |
| Defendants. | : | |

<u>**COOPER, District Judge**</u>

This consolidated matter comes before the Court on the motion of defendants Dominick Manzo, Carmella Manzo, and Ace-Manzo, Inc. (collectively "defendants") for summary judgment and to modify this Court's order of December 29, 2000, as amended on August 15, 2001 (dkt. entry nos. 264 & 269); the cross motion of plaintiff United States of America (the "United States"), on behalf of the Environmental Protection Agency ("EPA"), for summary judgment, declaratory relief, and to strike the testimony and report of defendants' expert (dkt. entry no. 265); and the separate cross motion of plaintiff New Jersey Department of Environmental Protection ("NJDEP") for summary judgment and declaratory relief (dkt. entry no. 266).  The court heard oral argument on the motion and cross motions on June 5, 2006.  For the reasons stated below, the Court will grant the part of the separate cross motions by the United States and NJDEP for summary judgment and declaratory relief; grant the part of the cross

motion by the United States seeking to exclude the report and
testimony of defendants' expert; and deny defendants' motion for
summary judgment and modification of the Court's December 29,
2000 order, as modified on August 15, 2001.

## BACKGROUND

The majority of material facts in this case are set forth in
detail in United States v. Manzo, 182 F.Supp.2d 385, 388-93
(D.N.J. 2001) ("Manzo I") and United States v. Manzo, 279
F.Supp.2d 558, 562-63 (D.N.J. 2003) ("Manzo II").  The United
States brought a claim against defendants under section 107(a) of
the Comprehensive Environmental Response, Compensation and
Liability Act ("CERCLA"), 42 U.S.C. § 9607(a).  (Compl., at ¶ 1.)
The United States seeks to recover from defendants response costs
that it has incurred in responding to the alleged release or
threatened release of hazardous substances at the Burnt Fly Bog
Superfund Site located on sixty acres of land in the Townships of
Marlboro and Old Bridge, New Jersey ("Site").  (Id. at ¶¶ 1, 7.)

Dominick and Carmella Manzo, who are husband and wife
(collectively "Manzos"), own three parcels of land on or near the
Site.  (Manzo I, at 388.)  The Manzos purchased the parcels
during the 1960s.  (Id. at 389.)  The Manzos acquired the first
parcel, formerly identified as Block 38, Lot 6A ("landfill
parcel"), in 1963.  (Id.)  The landfill parcel had been used as a
landfill before the purchase by the Manzos, and the Manzos

thereafter attempted to use this parcel as a landfill until the issuance of a zoning injunction against this type of use in 1969. (Id.)

The Manzos acquired the second parcel, formerly identified as Lot 43 ("Eagle parcel"), in 1965. (Id.) The Eagle parcel adjoined the landfill parcel and was used by third parties from the early 1950s until approximately 1963 for storage and disposal of waste oil, used filter clay, and sludge. (Id.) These materials were initially disposed of in waste oil lagoons ("Lagoons"), a sludge pile, and drums discarded at the Site. (Id.) In 1968, the Manzos purchased the third parcel, formerly known as Block 38, Lot 6 ("boarding home parcel"), on which was and remains situated a boarding home. (Id.)

The EPA and NJDEP began investigating the Site in 1979. (Id. at 390.) These investigations revealed hazardous substances, including but not limited to polychlorinated bi-phenyls ("PCBs"), lead, methylene chloride, trichloroethylene, chloroform, and benzene at the Site. (Id.) The EPA issued General Notice letters to defendants on February 8, 1982, informing them of their potential liability under section 107 of CERCLA, for hazardous contamination at the Site. (Id.) EPA placed the Site on the National Priorities List on September 1, 1983. (Id.)

The EPA and NJDEP entered into a cooperative agreement, pursuant to section 104(d) of CERCLA, which provided Superfund monies to NJDEP for work at the Site.  (Id. at 391.)  Under this cooperative agreement, NJDEP was assigned responsibility as the lead agency, and the EPA as the support agency, for the Site.  (Id.)  The EPA and NJDEP have coordinated response actions at the Site.  (Id.)

The EPA and NJDEP divided the Site into different areas: (1) the Uplands Area, (2) the Tar Patch Area, (3) the Contaminated Soils Area, (4) the Northerly Wetlands, (5) the Westerly Wetlands, and (6) the Downstream Area.  (Id.)  They also divided the Site remediation into three separate operable units.[1]  (Id.)  A separate record of decision ("ROD"), which documents the EPA's selection of a remedial action, has been issued by the EPA for each operable unit.  (Id.)

The EPA issued Record of Decision 1 ("ROD1") for Operable Unit 1 ("OU1") on November 16, 1983, which selected a remedy to address the contamination in the Uplands Area, Tar Patch Area, Northerly Wetlands, and Contaminated Soils Area.  (Id.)  The remedy selected for OU1 included the following response actions: (1) excavating and disposing of hazardous substances in the

---

[1]     The NCP defines the term "operable unit" in part as a "discrete action that comprised an incremental step toward comprehensively addressing site problems."  (Manzo I, at 402 (citing 40 C.F.R. § 300.5 (2000)).)

Lagoons, the sludge pile area, the Tar Patch Area, and the drummed waste area; (2) excavating and disposing of hazardous substances in the Northerly Wetlands and the Contaminated Soils Area; (3) restoring the original Site contours and replanting the excavated areas; and (4) studying the Westerly Wetlands further to determine the extent of contamination there. (Id. at 392.)

NJDEP conducted remedial actions in accordance with ROD1 between 1985 and 1990 including removal of the asphalt pile, removal of lagoon liquids, excavation and off-site disposal of approximately 85,000 tons of contaminated soil, and installation of a clay cap over the former lagoon area. (Id.) About 600 cubic yards of PCB-contaminated soil were removed in 1992 for off-site incineration. (Id.)

During the performance of OU1, the NJDEP and EPA determined that the Northerly Wetlands and Contaminated Soils Area should be remediated along with the Westerly Wetlands in a later operable unit because of their similar topographical and hydrogeological characteristics. (Id.) NJDEP contracted for the performance of a supplemental remedial investigation/feasibility study for the Westerly Wetlands and the Downstream Area, which was completed in 1983. The study confirmed the presence of high concentrations of lead and PCBs in the soils of the Westerly Wetlands and the Downstream Area. (Id.)

EPA issued Record of Decision 2 ("ROD2") for Operable Unit 2 ("OU2") on September 29, 1988, which was to be an "Interim Remedy" for the Westerly Wetlands and Downstream Area.  (Id.) OU2 included the following response actions: (1) excavating and disposing of contaminated soil in the Downstream Area; (2) containing the contaminated soil in the Westerly Wetlands by means of a sedimentation basin and appropriate diversion controls to prevent further migration; (3) building security fencing and an access road in the Westerly Wetlands; and (4) conducting a study on treatment alternatives for the Westerly Wetlands, the Northerly Wetlands, and the Contaminated Soils Area.  (Id.)

Construction of the security fencing along Spring Valley Road began on January 15, 1991, and was completed on February 15, 1991.  (Id.)  NJDEP hired a contractor in August 1992 to perform the remedial design for the removal of the contaminated soil in the Downstream Area and for construction of the sedimentation basin.  (Id.)  As part of the design investigation, the contractor also delineated the Tar Patch Area.  (Id.)  This remedial design was completed by May 1994.  (Id.)  Removal of the contaminated soil in the Downstream Area and construction of the sedimentation basin commenced on November 7, 1995, and the work was completed by the end of 1996.  (Id. at 392.)

The EPA issued Record of Decision 3 ("ROD3") for Operable Unit 3 ("OU3") on September 30, 1998, which selected a remedy for

the contamination in the Westerly Wetlands, the Northerly Wetlands, and the Tar Patch Area, previously known as the Tar Patch and Contaminated Soils Area.  (Id.)  The major components of OU3 include: excavation and off-site disposal of contaminated soil from the Northerly Wetlands and the Tar Patch Area; backfilling of the excavated areas and reestablishing or creating wetlands; security fencing around the Westerly Wetlands; recording a Deed Notice for the Westerly Wetlands, Northerly Wetlands, and Tar Patch Area; and monitoring of the Westerly Wetlands, Downstream Area, and Burnt Fly Brook.  (Id. at 393.)

The remedial work at the Site is now complete. (Decl. of John Frisco ("Frisco Decl."), at ¶ 98.)  The parties have stipulated to the amount of costs sought by the United States for cleaning up the Site.  (Tr. of 6-5-06 oral arg., at 9; see Stipulation as to Response Costs ("Stipulation"), attached to Declaration of Peter Flynn ("Flynn Decl.") as Ex. 2, at ¶ 1.)

The total costs incurred by the United States through December 31, 2004, for cleaning up the Site is $49,171,269. (Stipulation, at ¶ 1; Frisco Decl., at ¶ 35.)  This number only includes the costs incurred by the United States pursuant to its cooperative agreement with the NJDEP; it does not include non-cooperative agreement costs or indirect costs incurred by United States, prejudgment interest, or costs incurred by the Department of Justice ("DOJ") and the NJDEP.  (Stipulation, at ¶ 1.)

7

The United States seeks $31,089,534 in total unrecovered response costs, which includes direct, indirect and prejudgment interest, and is adjusted to reflect amounts received from prior settlements.  (Declaration of Wiley Wright ("Wright Decl."), at ¶¶ 31, 32, Table 1.)  This amount includes only those costs that defendants agree that the United States has adequately documented and accounted.  (Pl. Br., at 17; Def. Br., at 31; Stipulation, at ¶¶ 3, 5, 6, 8-10, 12, 22, 23.)  NJDEP seeks $4,805,614 in outstanding costs for cleaning up the Site pursuant to the New Jersey Spill Compensation and Control Act, 58 N.J.S.A. § 10-23.11, et seq. ("the Spill Act"). (Dkt. entry no. 266.)[2]

### RELEVANT PROCEDURAL HISTORY

The United States brought this action against defendants on January 14, 1997.  (Dkt. entry no. 1.)  On April 12, 1999, the State of New Jersey, on behalf of NJDEP, brought a separate action against Defendants in New Jersey Superior Court ("State Court") to recover its response costs at the Site pursuant to the

---

[2]   At the time of briefing, defendants argued that the total amount they owed NJDEP should be reduced to $4,442,034 after accounting for prior settlement proceeds attributable to ROD1.  (Def. Opp. Br., at 4-5 (dkt. entry no. 275).)  Both the United States and NJDEP maintained that NJDEP had not received any settlement proceeds. (Pl. Reply Br., at 9 (dkt. entry no. 281); Pl. NJDEP Reply Br., at 1 (dkt. entry no. 279).)  It is the Court's understanding that the issue has since been resolved through stipulation and that no reduction in the $4,805,614 requested by NJDEP is necessary.  (Tr. of 6-5-06 oral arg., at 9 (dkt. entry no. 266).)

Spill Act.  On August 19, 1999, the State Court action was removed to this Court, and was subsequently consolidated with this case.  (Manzo I, at 393.)

The Court bifurcated this action into liability and damages phases.  (Id.)  In Manzo I, this Court, inter alia, (1) held that the Manzos are liable parties as owners of a facility within the meaning of CERCLA, (2) held that Ace-Manzo, Inc., is a liable party as a transporter within the meaning of CERCLA; and (3) granted in part the motion of the United States to strike certain affirmative defenses of defendants.  (Manzo I, at 397-99.)  The Court further held that genuine issues of fact existed as to whether the harm was divisible among the defendants and other individuals causing harm at the Site.  (Id. at 404-05.)

The Court, after conducting a bench trial from June 11 through 14 and 24 through 25, 2002, to decide the divisibility issue, held on August 1, 2003, that defendants had not proven divisibility and were therefore jointly and severally liable for the response costs sought by the United States.  (Manzo II, at 561.)

The Court addressed NJDEP's action against defendants under the Spill Act in an opinion filed on July 30, 2004.  (7-30-04 Mem. Op. & Ord. (dkt. entry no. 246).)  The Court, inter alia, granted the NJDEP's motion for summary judgment as to liability under the Spill Act, granted its separate motion for summary

9

judgment striking all of the defendants' affirmative defenses, and denied defendants' cross motion for summary judgment.  (Id. at 33-34.)

## DISCUSSION

### I.    Standard of Review: Motion for Summary Judgment

Federal Rule of Civil Procedure ("Rule") 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met the initial burden, the non-moving party must present evidence establishing that a genuine issue of material fact exists, making it necessary to resolve the difference at trial.  Id. at 324; Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  A non-moving party must present actual evidence that raises a genuine issue of material fact, and may not rely on mere allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-moving party in deciding a motion for summary

judgment.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986).  The role of the judge at the summary
judgment stage is not to weigh the evidence, but to determine
whether there is a genuine issue for trial.  Anderson, 477 U.S.
at 249.  "By its very terms, the standard provides that the mere
existence of some alleged factual dispute between the parties
will not defeat an otherwise properly supported motion for
summary judgment; the requirement is that there be no genuine
issue of material fact."  Id. at 247-48 (emphasis in original).
Material facts are only those facts that might affect the outcome
of the action under governing law.  Id. at 248.  "[T]here is no
issue for trial unless there is sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that party.
If the evidence is merely colorable, or is not significantly
probative, summary judgment may be granted."  Id. at 249-50
(citation omitted).

## II.  Defendants' Motion

Defendants move for reconsideration of the Manzo I decision
regarding the applicability of the statute of limitations, and
for summary judgment on (1) the cost recovery claims of the
United States for ROD2 and ROD3 as barred by the applicable
statute of limitations; (2) in the alternative, the cost claims
of the United States related to ROD3 as barred by the statute of
limitations; and (3) the cost claims of the United States, in

whole or in part, as inconsistent with the National Contingency

Plan ("NCP").  (Def. Br., at 39.)  The Court will address

defendants' statute of limitations arguments in the first section

of this opinion, and address defendants' arguments that the

response actions of the United States were inconsistent with the

NCP as part of the Court's analysis of the cross motion by the

United States for summary judgment, in the second section of this

opinion.

### A.    The Statute of Limitations and Defendants' Request for Reconsideration Pursuant to Rule 54(b)

Defendants ask the Court to reconsider and modify its

decision in Manzo I in light of the decision in Colorado v.

Sunoco, Inc., 337 F.3d 1233 (10th Cir. 2003) ("Sunoco").

Defendants fail to meet their burden of demonstrating that this

alleged "intervening change in law" warrants reconsideration of

the Court's decision in Manzo I that the statute of limitations

for cost recovery actions under CERCLA did not bar recovery by

the United States.

Where there are some claims still pending in a case, a

motion for reconsideration may be filed in order to vacate or

revise a prior order pursuant to Federal Rule of Civil Procedure

54(b).  It states in relevant part:

> [A]ny order or other form of decision, however
> designated, which adjudicates fewer than all the claims
> or the rights and liabilities of all the parties . . .
> is subject to revision at any time before the entry of

12

judgment adjudicating all the claims and the rights and liabilities of all the parties.

"Although the district court has the power to revisit an earlier adjudication, the court is not required to do so and should not depart from prior rulings without good reason." Cataldo v. Moses, 361 F.Supp.2d 420, 432 (D.N.J. 2004). Reconsideration by a court after entry of an order is an "extraordinary remedy" and is granted "very sparingly." Id.

A court may grant a motion for reconsideration for one of the following reasons: "(1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice." Id. at 432-33. "[A]lthough another Circuit's views are entitled to due weight . . . they are not 'intervening authority' that would justify [] reconsideration." E.I. DuPont De Nemours & Co. v. United States, 460 F.3d 513, 542 n. 32 (3d Cir. 2006) (holding Third Circuit precedent that Potentially Responsible Parties cannot seek contribution for sua sponte cleanups under CERCLA was controlling, and that decisions to the contrary by other circuits were not intervening authority warranting reconsideration).

The Superfund Amendments and Reorganization Act of 1986 ("SARA") added to CERCLA the following statute of limitations provisions:

> An initial action for recovery of the costs referred to in section 9607 of this title must be commenced--
>
> **(A)** for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
>
> **(B)** for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. § 9613(g)(2). In Manzo I, the Court addressed "how to apply the statute of limitations provisions for cost recovery actions under CERCLA in the context of multiple RODs and operable units," where there was an "absence of a clear indication in SARA as to whether the United States may recover remedial expenses incurred for operable units when any recovery for the initial operable unit would be time barred." Manzo I, at 399-400. The Court agreed with the United States "that the claims based on OU2 and OU3 are not time-barred under the statute," despite the "absence of case law directly on this issue." Id.

The Court granted the motion by the United States for summary judgment as to defendants' statute of limitations defense and denied the cross motion by defendants for summary judgment as to the same aspect of this case as moot. Id. at 399. The Court reached this decision "based on the judicial presumptions

14

favoring this remedial result, the administrative framework
developed by EPA demonstrating the vital role played by operable
units in the remediation process, and general policy
considerations." Id.

The Court will not reconsider the decision in Manzo I
regarding the statute of limitations in light of the Tenth
Circuit's decision in Sunoco.  To the extent that the Sunoco
decision is not controlling precedent in this case because it is
a Tenth Circuit decision, it is not an "intervening change in the
law" that warrants this Court's reconsideration of the statute of
limitations issue.  E.I. DuPont, 460 F.3d at 542 n. 32.

Even if this Court were to reconsider the merits of Manzo I
in light of Sunoco as defendants request, this Court is not
persuaded by the Tenth Circuit's reasoning.  The district court
in Sunoco concluded that CERCLA's cost recovery statute of
limitations anticipates only one removal action and one remedial
action per site.  Based on this conclusion, the court held that
the statute of limitations on the state's cost recovery claims
for all remedial actions at the site began to run when physical
construction on the first remedial action began.  Sunoco, 337
F.3d at 1240.  The Circuit Court agreed with the district court's
"one action" interpretation and affirmed its holding, agreeing
"that the key issue in determining the timeliness of Colorado's
action is when 'physical on-site construction of the [first]

15

remedial action' occurred at the site." Id. at 1242 (changes in original)(quoting 42 U.S.C. § 9613(g)(2)(B)).

Instead of beginning its analysis with the conclusion that CERCLA's cost recovery statute of limitations anticipates only one removal action and one remedial action per site, this Court focused on the importance of distinct operable units and multiple RODs in response actions under CERCLA. Manzo I, at 402. The Court held that "this administrative scheme indicates that the statute of limitations does not bar compensation for operable units qualifying under the limitation even if the plaintiff is barred from seeking compensation for earlier operable units." Id. In so holding, the Court focused not only on the text of CERCLA's statute of limitations provisions, but also on the overall structure of the entire CERCLA statute, the relevant administrative framework, and the legislative policy favoring the United States's interpretation of the statute of limitations. This Court remains convinced that these considerations do not support a finding that there is only one removal or remedial action per site, and justify our interpretation that the statute of limitations contemplates multiple actions and allows cost recovery for subsequent operable units even where recovery for the first operable unit is time-barred.

16

**B.   Defendants' argument that recovery by the United States of costs for OU3 is barred by the statute of limitations**

Defendants also argue that the statute of limitations bars the United States from recovering costs for OU3 because the remedy implemented in OU3 was essentially the same as OU1.  This claim also requires us to reconsider our holding in Manzo I, where the Court found that "the undisputed facts indicate that OU2 and OU3 fall within the six-year limitations period for remedial actions."  Id. at 403.  This Court reasoned that OU3 satisfied the statute of limitations because at that point in the litigation OU3 was still in the remedial design stage, there was no evidence that any on-site construction had begun, and defendants made no arguments regarding when and how OU3 commenced.  Id. at 403-04.

Defendants now argue that the response costs for OU3 are barred by the applicable statute of limitations because physical on-site construction began more than six years before January 14, 1997.  (Def. Br., at 24.)  Although not specifically argued by defendants, they presumably ask the Court to reconsider the earlier decision in light of newly-acquired evidence made available subsequent to this Court's decision in Manzo I on the issue.  (Id. (citing to "Burnt Fly Associates Final Technical Progress Report," Ex. D to Declaration of Counsel, at pp. 1, 2 and 5).)

17

Defendants argue "[w]hat is now apparent, is that [the excavation and removal of contaminated soils] as selected in the 1983 Record of Decision and its physical on-site construction began in 1984." (Def. Br., at 25.) However, defendants fail to argue that this information was not previously available, which is a necessary prerequisite to a review of the merits. See Cataldo, 361 F.Supp.2d at 432 (holding that one of the reasons a court may grant a motion for reconsideration is evidence not previously available has become available).

Even if defendants' argument were not precluded by the Court's decision in Manzo I, the Court agrees with the United States that OU3 is a separate remedial action from OU1. (Pl. Opp. Br., at 22.) Defendants' argument, that the Court must impute the physical construction date for OU1 as the start date for OU3 because the remedy for both OUs was identical or indistinguishable, is not supported by the record. There were significant differences in the surface levels, volumes of soil removed and costs with regard to the remedies imposed in OU1 and OU3. (See e.g., Frisco Decl., at ¶¶ 17-19, 23, 55, 94, 96, 99; Frisco Deposition (Ex. 1 to Flynn Supp. Decl.), at 116.)

## III. The United States's Request for Summary Judgment

The United States has cross-moved for summary judgment on the issue of defendants' liability for its response costs under CERCLA § 107(a)(4)(A). The United States has submitted

documentation in support of its claim for $31,089,534 in total unrecovered response costs from defendants.  (Wright Decl., at ¶¶ 31, 32, Table 1.)  This amount only includes those costs to which the defendants have stipulated.  (Tr. of 6-5-06 oral arg., at 9; Stipulation, at ¶¶ 3, 5, 6, 8-10, 12, 22, 23.)  The parties have also resolved any cost documentation issues through stipulation. (Def. Br., at 31.)  Therefore, the Court finds that the United States has established a prima facie case that it is entitled to response costs in the amount of $31,089,534.  See United States v. Hardage, 982 F.2d 1436, 1442-43 (10th Cir. 1992) (holding that government had established same).

The burden of production now switches to defendants to demonstrate that the response action of the United States was inconsistent with the NCP because the choice of response action was arbitrary and capricious.  Id. at 1443.  Defendants argue that there are genuine issues of material fact that some of the United States's costs for OU2 and OU3 should be disallowed in whole or in part because they were inconsistent with the NCP. (Def. Br., at 39.)  The United States argues that it is entitled to summary judgment and declaratory relief because defendants have not met their burden of showing that the United States was inconsistent with the NCP.  (Pl. Br., at 6; Pl. Resp. Br., at 2.)

"The government is authorized to recover, inter alia, 'all costs of removal or remedial action incurred by the United States

government . . . not inconsistent with the National Contingency Plan.'" United States v. E.I. DuPont de Nemours and Co., 432 F.3d 161, 169 (3d Cir. 2005) (quoting 42 U.S.C. §§ 9607(a)(1)-(4)(A)).  Response costs are presumed consistent with the NCP "unless a responsible party overcomes this presumption by establishing the [United States's] response action giving rise to the costs is inconsistent with the [NCP]." Id. at 178.  "Costs, by themselves, cannot be inconsistent with the NCP.  Only response actions – i.e., removal or remedial actions – can be inconsistent with the NCP, which can be demonstrated by showing that the government's choice of response action was arbitrary and capricious." Hardage, 982 F.2d at 1443 (noting that "the NCP regulates choice of response actions, not costs").

The parties have agreed that this Court "shall uphold the [EPA's] decision in selecting a response action unless the [defendants] can demonstrate, on the administrative record, that the decision was arbitrary and capricious, or otherwise not in accordance with law." 42 U.S.C. § 9613(j)(2) (see dkt. entry no. 259.)  "In applying this standard, our only task is to determine whether [the EPA] considered the relevant factors and articulated a rational connection between the facts found and the choice made." W.R. Grace & Co. v. U.S. E.P.A., 261 F.3d 330, 337 (3d Cir. 2001) (citation and quotations omitted) (reviewing final agency action by EPA under Safe Water Drinking Act); see DuPont,

432 F.3d at 179 (holding that party had not established arbitrary or capricious government response and therefore giving "deference to the EPA's choice of response action" and refusing to substitute its own judgment for that of the EPA).  This Court cannot accept "post hoc rationalizations for agency action" and "may not uphold the order unless it is sustainable on the agency's findings and for the reasons stated by the agency." W.R. Grace & Co., 261 F.3d at 338.

Defendants allege three ways in which the response actions of the United States were inconsistent with the NCP: (1) timeliness; (2) public involvement in remedy selection; and (3) cost effectiveness.  (Def. Br., at 31, 33.)  For the following reasons, we conclude that defendants have not met their burden of showing that the response actions of the United States were arbitrary and capricious, or otherwise not in accordance with law, and therefore have not shown that the response of the United States was inconsistent with the NCP.

There is no specific timeliness requirement in the NCP that defendants allege the United States failed to follow.  Rather, they merely cite to the preamble to the 1990 NCP and parts of other NCP provisions referencing procedures designed to help create prompt responses and frameworks for short term removal actions.  (Def. Br., at 26.)  Defendants' factual support for their timeliness argument is similarly vague, and their only

detailed allegations are that: (1) the decision of the United States "to construct the sedimentation basin [in ROD2] was arbitrary and motivated by a desire to delay rather than implement the remediation" and (2) "the wetlands assessment and treatability studies were a distraction to buy time."  (Def. Br., at 34-35.)

The Court will not read a specific timeliness requirement into CERCLA based on the general arguments advanced by defendants.  Moreover, even if such a requirement existed, defendants do not provide any evidence and the record does not reveal that either of these two decisions were motivated by the EPA's desire to delay the remedial process.  The decisions made by the United States in ROD2 attacked by defendants were part of "an interim remedy for the Westerly Wetlands portion of the [site]." (Frisco Decl., Ex. 10, p. 2.)  The United States explained in its ROD2 report that "temporary containment" alternatives, such as the sedimentation basin that was ultimately chosen, were selected because sufficient information was not available to evaluate potential treatment technologies to eliminate the PCP and lead contamination in the Westerly Wetlands.  (Id. at p. 9.)  Treatability studies were necessary before selecting the "final remedy" for the contaminated soil in ROD3 because of the lack of sufficient information about the contaminants.  (Id.)  Without such an interim remedy, the

contaminated soil would have continued to migrate beyond the Westerly Wetlands.  (Id., at 10.)  We find that the United States made a rational decision to balance the immediate need to stop the spreading of the contaminated soil in the Wetlands with the need for more information before embarking on a more permanent solution.

Defendants also do not point to a specific section of the public participation requirements of the NCP that they allege the United States violated.  See 42 U.S.C. § 9617.  Instead, defendants makes general allegations that the United States "did not accurately and adequately inform the public . . . that there was no emergency in remediating the site; that a boring program was necessary to do the job right; and that the agency had not allocated sufficient funding to remediate the site."  (Def. Br., at 37.)

Section 9617 of CERCLA, added when SARA was enacted, "requires EPA to provide notice and a reasonable opportunity for comment as well as the opportunity for a public meeting near the cleanup site."  Neighborhood Toxic Cleanup Emerg. v. Reilly, 716 F.Supp. 828, 836 (D.N.J. 1989).  Defendants' allegations, that the United States failed to reveal material facts to the public, are without legal or factual foundation sufficient to support a finding that the response actions taken by the United States with regard to public participation were arbitrary or capricious or

otherwise not in accordance with the law.  Moreover, the Court's review of the record confirms that the United States complied with CERCLA's public notice and participation requirements. (Frisco Decl., at ¶¶ 27-36, ¶¶ 99-102; Id. at Ex. 1, p. 6; Id. at Ex. 10, p. 8.)

CERCLA only requires the United States to consider cost-effectiveness in selecting a permanent remedy, not with regard to individual costs during implementation of that remedy.  United States v. Kramer, 913 F.Supp. 848, 850 n. 1, 859 (D.N.J. 1995); Hardage, 982 F.2d at 1443; see 40 C.F.R. §§ 300.68(g), (i) (1986 NCP); 40 C.F.R. §§ 300.430(e)(9)(iii)-(f)(1)(i) (1994 NCP). Defendants do not appear to cite to or suggest a feasible, more cost-effective remedy disregarded by the United States in its selection of the permanent remedy in ROD3.  Defendants only argue that there were more cost-effective ways of selecting the permanent remedy – i.e., following the recommendation of consultants to conduct a boring survey before beginning excavation and removal, and conducting treatability studies before clearing the forested wetlands.  (Def. Br., at 34-35.)

The RODs for OU2 and OU3 demonstrate that the United States, despite defendants' arguments to the contrary, took cost-effectiveness into consideration when selecting a remedial action.  The United States compared the capital, annual operation and maintenance, and present worth cost for each alternative.

24

(Frisco Decl., Ex. 10, pp. 17-21; Id. at Ex. 1, pp. 19-25.)  The
alternatives considered by the United States in ROD2 ranged in
estimated cost from $500,000 to 17.1 million for construction,
but the remedial action chosen cost only an estimated 2.21
million for construction.  (Id. at Ex. 10, pp. 17-21.)  Likewise,
the remedial action selected in ROD3 was at the lower end of the
estimated cost range for all of the alternatives.  (Id. at Ex. 1,
pp. 30,39.)  The Court concludes that the response actions taken
by the United States were not arbitrary and capricious, or
otherwise not in accordance with law, in its consideration of
cost-effectiveness when selecting a remedial alternative.

Having determined that the response actions of the United
States were not arbitrary and capricious, or otherwise not in
accordance with law, it is unnecessary for the Court to decide
whether defendants have met their burden of establishing
"demonstrable excess costs."  Kramer, 913 F.Supp. at 866.
"[D]efendants can only challenge costs once they establish that
the action giving rise to those costs was inconsistent with the
NCP."  Id. at 862 (noting that CERCLA does not limit the
government's recovery to "reasonable" costs).  Defendants have
not established that the response actions of the United States
were inconsistent with the NCP and therefore our inquiry ends
here.  The Court will grant the part of the cross motion by the

25

United States for summary judgment on the issue of defendants'
liability for its $31,089,534 in response costs under CERCLA.

## IV.  Defendants' Expert's Report and Testimony

Defendants offer the report and proffered testimony of
Stephen A. Johnson in support of their argument that the United
States's decisions during the remedial action at the Site were
inconsistent with the NCP.  (Johnson Expert Report, dkt. entry
no. 272, Ex. 1.)  The United States argues that the report and
testimony should not be admitted into evidence or considered by
the Court because (1) they offer inadmissible legal conclusions
and (2) none of the exceptions to the general rule that the
court's review of agency decisions is limited to the
administrative record apply.  (Pl. Br., at 24-26.)

"The focal point for judicial review should be the
administrative record already in existence, not some new record
made initially in the reviewing court."  Horizons Int'l, Inc. v.
Baldridge, 811 F.2d 154, 162 (3d Cir. 1987).  Where "the
reviewing court simply cannot evaluate the challenged agency
action on the record before it, the proper course, except in rare
circumstances, is to remand to the agency for additional
investigation or explanation."  Id.; see also United States v.
Princeton Gamma-Tech, Inc., 817 F.Supp. 488, 493 (D.N.J. 1993)
(articulating limited circumstances where court will consider
evidence outside of the administrative record), rev'd on other

grounds, 31 F.3d 138 (3d Cir. 1994).  Defendants present no
viable argument, other than the expert report is necessary to
support their argument, as to why it is necessary for the Court
to consider additional evidence beyond the comprehensive
administrative record.  The Court grants the cross motion of the
United States insofar as it requests the Court not to consider
the report or testimony of defendants' expert.

**V.   NJDEP's Request for Summary Judgment**

NJDEP seeks $4,805,614 in outstanding costs for cleaning up
the Site pursuant to the Spill Act.  (Dkt. entry no. 266.)
Defendants did not file a response to the NJDEP's request for
summary judgment.  Moreover, in their brief in opposition to the
request by the United States for summary judgment, defendants
conceded that their only dispute with NJDEP's request for summary
judgment was the amount due, which has since been resolved via
stipulation by the parties.  (Def. Opp. Br., at 4.; Tr. of 6-5-06
oral arg., at 9.)  Therefore the Court grants the part of NJDEP's
cross motion seeking summary judgment on defendants' liability
for $4,805,614 in costs expended by NJDEP in cleaning up the Site.

**VI.  Requests for Declaratory Judgments**

Both the United States and NJDEP seek a judgment declaring
that defendants are jointly and severally liable for any
additional response costs at the Site.  The current amount sought
by the United States and NJDEP only covers response costs

27

calculated through December 31, 2004.  (Stipulation, at ¶ 1.)
For the following reasons, the Court will issue a judgment
declaring defendants liable for future recovery costs, but allow
defendants to challenge any of those costs on an equitable basis
should new evidence or events warrant the Court's intervention in
quantifying recoverable future costs.

In a successful cost recovery action under CERCLA, "the
court shall enter a declaratory judgment on liability for
response costs or damages that will be binding on any subsequent
action or actions to recover further response costs or damages."
42 U.S.C. § 9613.  "[W]hen the District Court enters a []
declaratory judgment covering future costs . . . the judgment
should contain some kind of provision authorizing the parties to
re-litigate the allocation of those costs for good cause shown in
response to new events or new evidence that would reasonably bear
upon the equity of the allocation."  Beazer E., Inc. v. Mead
Corp., 412 F.3d 429, 449 (3d Cir. 2005) (emphasis in original)
(noting Third Circuit's agreement with other courts favoring such
contingency provisions in CERCLA contribution actions); see F.P.
Woll & Co. v. Fifth & Mitchell St., Corp., No. 96-5973, 2006 WL
2381778, at *8 (E.D. Pa. Aug. 16, 2006) (issuing a judgment
declaring recovery of future costs in cost recovery action, on
the condition that plaintiff show that any expenses incurred in
the future are properly considered response costs).

28

The United States and NJDEP have shown that no issues of material fact exist as to defendants' monetary liability for their costs in cleaning up the Site.  Therefore, the Court is required under CERCLA to grant both the United States's and NJDEP's requests for declaratory judgment.  The Court will do so, but with the caveat that pursuant to the Third Circuit's instructions in <u>Beazer</u>, 412 F.3d at 449, the order will include a "provision authorizing the parties to re-litigate the allocation of those costs for good cause shown in response to <u>new events</u> or <u>new evidence</u> that would reasonably bear upon the equity of the allocation."  <u>Id.</u>

## CONCLUSION

The Court will grant the cross motion of the United States for summary judgment, declaratory relief and to strike the testimony and report of defendants' expert.

The Court will also grant the cross motion of the NJDEP for summary judgment and declaratory relief.

The Court will deny defendants' motion for summary judgment and to modify the Court's order of December 29, 2000, as amended on August 15, 2001.

The Court will issue an appropriate order.


    s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


29